UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| YESSENIA RAMOS, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-17-2852 |
| | § | |
| PERFORMANCE CONTRACTING INC., | § | |
| | § | |
| *Defendant*. | § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the court is defendant Performance Contracting Inc.'s ("PCI") motion for summary judgment. Dkt. 32. Plaintiff Yessenia Ramos responded (Dkt. 33) and PCI replied (Dkt. 35).[1] After considering the motion, response, reply, record evidence, and applicable law, the court is of the opinion that PCI's motion should be GRANTED IN PART and DENIED IN PART.

**I. BACKGROUND**

This is a Title VII sexual harassment and retaliation case. Ramos worked as a helper/attendant on PCI construction sites from March to December of 2016. Dkt. 32-1 at 5, 26 (Ramos Depo.). Ramos's job duties included building and breaking down scaffolds, transporting materials, and monitoring confined spaces for oxygen levels and other safety indicators. *Id.* at 6.

**A. Ramos's Hostile Work Environment Allegations**

Ramos alleges that a foreman on her job site, Juan Franco Vega, began harassing her on August 5, 2016. Dkt. 32-6 at 2 (Ramos Written Statement); Dkt. 32 at 9. Vega first made comments about Ramos's appearance and sexuality. Dkt. 32-5 at 3 (EEOC Charge); Dkt. 33-1 at 8 (Ramos

---

[1] In its reply, PCI objects that Ramos's response was untimely and should be stricken. Dkt. 35 at 1. However, the court subsequently ordered that the response would be considered timely. Dkt. 38.

Depo.). In the following days, Vega's harassment intensified. Vega began asking Ramos about the color of her underwear. Dkt. 32-5 at 3 (EEOC Charge). Vega also began referring to Ramos's vagina as "la tortuga," or turtle, and stated that he "loved to eat turtle." *Id.* Vega continued to make similar statements and sometimes made "moaning sounds" while "sticking out his tongue in a sexual manner." *Id.* Ramos reported that Vega ran his fingers over her arm, back, and face without her consent. *Id.* Ramos attempted to avoid Vega as the harassment escalated, but Vega would specifically instruct other workers to drop Ramos off at Vega's location. *Id.* When Ramos confronted Vega about his behavior, Vega threatened to fire her. Dkt. 33-1 at 12–13 (Ramos Depo.). Ramos began to feel uncomfortable and unsafe, sometimes tying a long-sleeve shirt around her waist to avoid drawing attention to herself. Dkt. 32-5 at 4 (EEOC Charge).

The harassment continued for exactly one week. On August 12, 2016, Vega began to "whistle and moan" at Ramos while instructing her to look at him. *Id.* at 3. Vega also inquired whether Ramos had done her stretches for the day and became angry when Ramos stated that she had already completed them. *Id.* About ten minutes later, Ramos reported Vega's behavior to onsite safety manager Brian Johnson and site safety representative Latisha Hayes.[2] Dkt. 32 at 9; Dkt. 32-1 at 106 (Ramos Depo.); Dkt. 32-5 at 3 (EEOC Charge). Hayes instructed Ramos to submit a written statement, and Ramos complied. Dkt. 32-1 at 106 (Ramos Depo.); Dkt. 32-6 (Ramos Written Statement). Hayes and Ramos then spoke to Anthony Morales, the project manager at the site, and Ramos recounted her allegations. Dkt. 32-1 at 106 (Ramos Depo.); Dkt. 32-7 at 2 (Morales

---

[2] At that time, Ramos also reported being harassed by two other PCI employees at unspecified earlier dates. Dkt. 33-5 at 4 (Ramos Written Statement). However, while Ramos references the two other employees in her complaint, Ramos's subsequent briefing only addresses the Vega incident and Ramos has represented that the only basis for this suit is Vega's harassment and its aftermath. Dkt. 33 at 5 ("Multiple employees of Defendant exhibited unacceptable behavior toward Plaintiff throughout her employment with PCI, whether it was the sexual harassment made the basis of this suit or the aftermath of Plaintiff's complaint of said sexual harassment. The sexual harassment occurred for roughly eight days in a row."); *see also* Dkt. 32-1 at 18–19 (Ramos Depo.) (stating that "[Vega] was the issue, not Robert or Miguel" and that the other employees did make sexual advances, "but they weren't disrespectful about it").

Timeline). Tim Lampard, the Houston operations manager, was also notified of the incident. Dkt. 32-8 at 2.

Vega was escorted off of the job site that afternoon and did not work with Ramos again. Dkt. 32-7 at 2 (Morales Timeline); Dkt. 32-1 at 118–19 (Ramos Depo.). Morales also began conducting an investigation into the incident and interviewed nine alleged witnesses. Dkt. 32-7 at 3. Lampard oversaw the investigation and provided updates to PCI's human resources department. Dkt. 32-8 (Lampard Email Aug. 17); Dkt. 32-11 (Lampard Email Sept. 1).

In the following days, Ramos met with Morales and Hayes for four follow-up meetings. Dkt. 32-7 at 2–3 (Morales Timeline). At her first follow-up, Ramos was very upset and reported that other members of the construction crew knew that she had filed a harassment report. *Id.* at 2. Ramos testified that other employees either laughed at her or became quiet around her. Dkt. 33-1 at 5–6, 18 (Ramos Depo.). The employees also joked that they should stay away from her so that she would not report them for harassment. Dkt. 33-1 at 5–6 (Ramos Depo.); Dkt. 32-7 at 2 (Morales Timeline). Morales offered to transfer Ramos to a different labor group, but Ramos declined because she was afraid a transfer would give her a bad reputation. Dkt. 32-7 at 2 (Morales Timeline). Several days later, Ramos told Morales that she was uncomfortable working with Vega's brother, and Morales instructed a site superintendent to ensure that Ramos and Vega's brother were on different crews. *Id.*

By the end of the week, Ramos chose to discontinue her follow-up meetings with Morales and Hayes because she felt that "it wasn't solving anything" and finding Morales had become a "hassle." Dkt. 33-1 at 17 (Ramos Depo.); Dkt. 32-7 at 3 (Morales Timeline). Ramos also expressed concern that Morales was friends with Vega. Dkt. 32-8 at 2 (Lampard Email Aug. 17). Ramos testified that Morales offered to pay her without her coming to work, but she refused because she felt

3

as if Morales was trying to cover up the incident. Dkt. 33-1 at 4, 10 (Ramos Depo.). However, Ramos continued to speak with Lampard in September, October, and November of 2016. Dkt. 32-1 at 21–22 (Ramos Depo.).

On September 1, 2016, Lampard notified PCI's human resources department that the investigation was nearing conclusion. Dkt. 32-11 (Lampard Email Sept. 1). Lampard stated that one interviewed witness seemed to substantiate Ramos's claim that "*something* inappropriate was taking place," but the evidence was not substantial enough to "take any serious disciplinary action" against Vega. *Id.* at 2. Lampard stated that he intended to review PCI's harassment policy with Vega, give Vega a verbal warning, and ensure that Vega was not placed at Ramos's job site. *Id.* Lampard intended to inform Ramos that "appropriate action" was taken in her case and to counsel her to report harassment more quickly in the future. *Id.* Ramos was also to continue weekly meetings with a "member of management" to ensure that Ramos continued to communicate with PCI leadership. *Id.* Lampard also stated that Ramos's job site would undergo harassment training in the following weeks. *Id.*

## B. Ramos's Retaliation Allegations

However, Ramos continued to feel uncomfortable at her job site. In addition to other employees treating her differently, Ramos alleges that PCI retaliated against her for reporting Vega's harassment. Ramos contends that PCI: (1) switched her from a day shift to a night shift; (2) required her to do more strenuous physical labor, such as carrying a 10-gallon container of water up stairs; (3) removed some of her responsibilities and gave them to other employees; (4) denied her overtime; and (5) gave her an unwarranted reprimand. Dkt. 12 at 6–7 (third amended complaint); Dkt. 32-1 at 23–25, 27–28 (Ramos Depo.).

4

On November 8, 2016, Ramos filed an EEOC discrimination charge against PCI. Dkt. 32-5. She alleged sex discrimination and retaliation. *Id.* PCI ultimately terminated Ramos's employment on December 1, 2016, for failure to come to work for three consecutive days. Dkt. 32-1 at 26 (Ramos Depo.). Ramos does not claim that her termination was retaliatory. *Id.* at 25, 27; *see also* Dkt. 33 at 11.

## II. LEGAL STANDARD

A court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). If the moving party meets its burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e). The court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008).

## III. ANALYSIS

### A. Hostile Work Environment Claim

In order to establish a hostile work environment/sexual harassment claim under Title VII, a plaintiff must show that: (1) she belongs to a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take remedial action. *Septimus v. Univ. of Hous.*, 399 F.3d 601, 611 (5th

Cir. 2005). Here, the parties dispute whether Vega's harassment was so "severe or pervasive" as to affect a term or condition of Ramos's employment under the fourth element. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754, 118 S. Ct. 2257 (1998); *see also Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263–64 (5th Cir. 1999). The parties also dispute whether the claim is barred by PCI's *Faragher/Ellerth* defense. Dkt. 32 at 18; Dkt. 33 at 7. However, the court need not reach those issues because Ramos cannot establish the fifth element of her claim as a matter of law.

"A defendant may avoid Title VII liability when harassment occurred but the defendant took 'prompt remedial action' to protect the claimant." *Williams-Boldware v. Denton Cty.*, 741 F.3d 635, 640 (5th Cir. 2014). The remedial action must be "reasonably calculated" to end the harassment. *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 615–16 (5th Cir. 1999). However, "[e]mployers are not required to impose draconian penalties upon the offending employee in order to satisfy this court's prompt remedial action standard." *Williams-Boldware*, 741 F.3d at 640. In determining whether the employer's remedial actions are sufficient, courts consider "whether the offending behavior in fact ceased." *Skidmore*, 188 F.3d at 616; *see also id.* (collecting cases). Although the sufficiency of remedial action is a fact-intensive inquiry, courts often find that an employer took prompt remedial action as a matter of law. *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 329 (5th Cir. 2004).

Here, PCI took prompt and sufficient remedial action as a matter of law. First, and most importantly, PCI's actions stopped Vega's harassment. PCI management escorted Vega off of the job site the same day that Ramos made her report, and Ramos never worked with Vega again.[3]

---

[3] Ramos does allege that Vega returned to her job site some time after the harassment incident. Dkt. 12 at 7–8. However, this incident occurred after Ramos's employment was terminated. Dkt. 32-1 at 16–17 (Ramos Depo.). Ramos acknowledges that she only found out about Vega's presence through a friend who still worked at PCI. *Id.*

Dkt. 32-7 at 2 (Morales Timeline); Dkt. 32-1 at 16–17 (Ramos Depo.). Additionally, PCI gave Vega a verbal warning for his behavior and re-trained him on PCI's sexual harassment policy. Dkt. 32-11 (Lampard Email Sept. 1). Ramos testified that Vega never harassed her again. Dkt. 32-1 at 16–17 (Ramos Depo.). This fact alone strongly suggests that PCI's remedial actions were reasonably calculated to end the harassment.

Moreover, PCI took several other steps to address the reported harassment. Morales conducted an investigation, including interviews with nine witnesses, into the incident. Dkt. 32-9 (Morales Statement). While the results were inconclusive, PCI still disciplined Vega based on the investigation and Ramos's statements. Dkt. 32-11 (Lampard Email Sept. 1). Further, even after Ramos discontinued her meetings with Morales, PCI officially requested that Ramos continue to meet with a "member of management" weekly for a month and Lampard spoke to Ramos over the phone several times in the following months. *Id.*; Dkt. 32-1 at 22. Finally, PCI conducted additional sexual harassment training for Ramos's job site. Dkt. 32-11 (Lampard Email Sept. 1). PCI's HR department preemptively reviewed each of these actions. *Id.*

Despite PCI's thorough response, Ramos contends that PCI's remedial actions were insufficient because: (1) Vega was not fired; (2) PCI's human resources department was not involved in the investigation; and (3) the investigation was not kept confidential, which resulted in Ramos's coworkers "laugh[ing] and mak[ing] jokes" around her. Dkt. 33 at 5–7. However, none of these alleged defects renders PCI's response insufficient.

First, Title VII does not require an employer to fire offending employees. *Williams-Boldware*, 741 F.3d at 640*; see also Kreamer v. Henry's Towing*, 150 F. App'x 378, 382 (5th Cir. 2005) (per curiam) ("[A]n employer need not impose the most severe punishment to comply with

7

Title VII."). It is immaterial that Ramos wanted PCI to fire Vega, or that Ramos believed that PCI should fire Vega under PCI's "zero tolerance policies."[4] *See* Dkt. 33 at 7.

Second, Ramos's allegation that HR was not involved is factually incorrect. Although it appears that Lampard, not HR, was primarily responsible for PCI's official response, Lampard advised HR of his proposed actions beforehand and requested that HR approve them. *Id.* Ramos does contend that she called an HR representative directly and the representative never returned her call. Dkt. 33-1 at 15 (Ramos Depo.). However, Title VII merely requires that an employer's remedial actions be "reasonably calculated" to end the harassment. *Skidmore*, 188 F.3d at 615–16. It does not entitle a plaintiff to specific remedial measures of her choosing.

Third, Title VII does not mandate confidentiality. In *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d at 611, the Fifth Circuit held that an employer took prompt remedial action as a matter of law when the complained-of harassment stopped, even though the plaintiff testified that "rumors about [the plaintiff's] sexual harassment complaint circulated around the office and caused other employees to ostracize her." Here, as in *Skidmore*, the complained-of harassment ceased because the employer took prompt remedial action upon receiving the complaint. While Ramos's coworkers laughed at, made jokes about, or refused to talk to Ramos, all of this conduct is merely ostracizing and does not rise to the level of continuing harassment.[5] *Id.*; *see also Aryain*

---

[4] Notably, Ramos acknowledges that she never informed anyone that she wanted PCI to fire Vega. Dkt. 33 at 7. Moreover, contrary to Ramos's assertions, PCI's harassment policy does not require that any offending employee be fired. *See* Dkt. 33-4 at 4 (PCI Harassment Policy) (listing the factors PCI considers in taking disciplinary action, and stating only that "appropriate disciplinary action, up to and including discharge, will be taken.").

[5] Moreover, PCI's harassment policy expressly cautions that PCI "cannot promise complete confidentiality" because the company's duty to investigate "may require the disclosure of information to individuals with a need to know." Dkt. 33-4 at 4. In meetings with Ramos, PCI management stated that their conversations were "absolutely" confidential, but that management had

*v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 478, 485 (holding that a plaintiff's allegations were not actionable when the plaintiff's supervisors "would look at [the plaintiff] angrily, laugh at her, and talk negatively about her" following the plaintiff's harassment report).

In sum, PCI took prompt remedial action in response to Ramos's harassment complaint. These actions were reasonably calculated to stop the harassment and did, in fact, stop the offensive behavior. Although Ramos remained uncomfortable at work, such discomfort does not rise to the level of a Title VII violation. *See Skidmore*, 188 F.3d at 611, 616 (holding that an employer took prompt remedial action, even though the plaintiff "remained uncomfortable" at work). Therefore, Ramos's hostile work environment claim fails.

**B. Retaliation Claim**

Second, Ramos argues that PCI retaliated against her for filing a harassment report. Dkt. 33 at 10–12. Title VII retaliation claims are governed by the three-step *McDonnell Douglas* test. *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 388 (5th Cir. 2007). Under the *McDonnell Douglas* test, the plaintiff must demonstrate a *prima facie* case of retaliation by showing: (1) she engaged in protected activity under Title VII; (2) she was subjected to an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. *Id.*

Once the plaintiff has established a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007). "The employer's burden is only one of production, not persuasion, and involves no credibility assessment." *Id.* If the employer carries its burden, the

---

to inform the employees involved in the investigation about Ramos's allegations. Dkt. 32-7 at 2 (Morales Timeline).

plaintiff "bears the ultimate burden" of proving that the employer's proffered reason is mere pretext for the real retaliatory purpose. *Id.* Under this framework, the plaintiff's ultimate burden is to prove that the adverse employment action would not have occurred "but for" her protected conduct. *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 133 S. Ct. 2517 (2013).

### 1. Protected Activity

First, the parties dispute whether Ramos's August 2016 report to PCI management constitutes "protected activity" under Title VII. In its reply, PCI appears to argue—despite expressly disclaiming the argument in its original motion—that Ramos did not engage in protected activity until she filed her EEOC charge in November 2016. Dkts. 32 at 22, 35 at 5. PCI argues that because much of the alleged retaliation occurred before November 2016, PCI's actions could not have been retaliatory as a matter of law. Dkt. 35 at 5.

PCI's argument fails. A plaintiff has engaged in protected activity when she opposes any employment practice that she reasonably believes is unlawful under Title VII, or when she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a); *EEOC v. Rite Way Serv., Inc.*, 819 F.3d 235 (5th Cir. 2016). Ramos's first report on August 12, 2016, plainly fits this description. At that time, Ramos both opposed the alleged sexual harassment and filed a report concerning the harassment with PCI management. Dkt. 32-1 at 106 (Ramos Depo.); Dkt. 32-5 at 3 (EEOC Charge). Ramos's August 12 report was protected activity as a matter of law, and PCI's actions after that time could have been retaliatory.

**2. Adverse Employment Action**

Ramos must next show that she was subject to a material adverse employment action, "which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405 (2006) (internal quotations omitted) (quoting *Rochon v. Gonzalez*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (hereinafter "*Burlington*"). "Even if the employer took an adverse action with the intent to retaliate against the employee, the adverse actions must satisfy the materiality requirement to be actionable." *Magiera v. City of Dallas*, 389 F. App'x 433, 437 (5th Cir. 2010) (citing *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 331 (5th Cir. 2009). Ramos alleges that PCI retaliated by: (1) changing her from day shifts to night shifts; (2) requiring her to do more physically difficult labor; (3) moving her to different crews and replacing her with a less experienced employee; (4) giving her less overtime; and (5) giving her a formal reprimand without reason. Dkt. 33 at 11. PCI disputes the factual accuracy of several of these allegations, and further contends that none of the allegations constitute material adverse actions under *Burlington*. Dkt. 32 at 23–24.

    i.    *Day-to-Night Shift Change*

First, "[a] shift change in and of itself is probably not sufficient" to support a retaliation claim. *Johnson v. Halstead*, 916 F.3d 410, 421 (5th Cir. 2019). However, a shift change *can* constitute a material adverse action if the change "places a substantial burden on the plaintiff, such as . . . drastically and objectively less desirable hours." *Id.* The Fifth Circuit has recently held that an employer took material adverse action by transferring an employee from daytime shifts during the week to night shifts on the weekend. *Id.* The court reasoned that "in terms of that timing, either hours or days, the shift change could dissuade [a plaintiff] from making a discrimination complaint." *Id.* Here, Ramos testified that she was placed on the night shift following her August 12 complaint.

Dkt. 32-1 at 27–28. Ramos *did* testify that PCI placed her back on the day shift upon request. *Id.* However, transfer back to the day shift was not guaranteed, and the mere threat of having to work nights could be enough under Fifth Circuit precedent to dissuade a reasonable employee from reporting harassment. *See Johnson*, 916 F.3d at 421. Thus, Ramos's shift change is material and actionable under Title VII.[6]

        ii.     *Job Duty Reassignment*

Second, Ramos alleges that PCI changed her duties to more physically demanding tasks after she reported Vega's harassment. Dkt. 32-1 at 23–24 (Ramos Depo.). PCI argues that Ramos's job as a helper/attendant required Ramos to be flexible and complete a wide range of tasks, including physically challenging ones. Dkt. 32 at 24. Because all of the tasks Ramos had to complete were within her job description, PCI argues, such variation in her job duties is not materially adverse. *Id.* at 26.

However, the Supreme Court has squarely rejected this position. In *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. at 70, the Court held that a construction worker plaintiff demonstrated a *prima facie* case of retaliation when the plaintiff was reassigned from forklift duty to standard laborer tasks. The employer defendant argued that "reassignment of duties cannot constitute retaliatory discrimination where, as here, both the former and present duties fall within the same job description." *Id.* The Court disagreed:

---

[5] In *Benningfield v. City of Houston*, 157 F.3d 369, 377 (5th Cir. 1998), the Fifth Circuit held that changing an employee from day to night shifts is not a materially adverse action under Title VII. However, Fifth Circuit precedent at that time limited material adverse actions to "discharges, demotions, refusals to hire, refusals to promote, and reprimands." *Id.* at 376. In 2006, the Supreme Court rejected that test and expanded the definition of material adverse actions to include all actions that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68.

> Almost every job category involves some responsibilities and duties that are less desirable than others. Common sense suggests that one good way to discourage an employee . . . from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable.

*Id.* at 70–71. The Court cautioned that "reassignment of job duties is not automatically actionable," and material adversity "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* (citations and quotations omitted). However, the *Burlington* Court ultimately concluded that the plaintiff's unfavorable reassignment, considering all circumstances, could have dissuaded a reasonable employee from reporting harassment. *Id.*

Here, Ramos has raised a genuine issue of material fact as to whether PCI reassigned her to more arduous work in retaliation for filing a harassment report. Ramos testified that before the harassment report, her duties normally consisted of seated monitoring work. Dkt. 32-1 at 23–24 (Ramos Depo.). However, after the harassment report, Ramos testified that PCI required her to complete more hard labor duties and other physical tasks that she had not previously done. *Id.* (stating that after filing the report, she would have to carry ten-gallon buckets of water up stairs and other "hard labor stuff"). In light of all the circumstances, Ramos's reassignment could have dissuaded a reasonable worker in Ramos's position from making or supporting a report of discrimination. *See Burlington*, 548 U.S. at 68. Therefore, Ramos' reassignment, if proven, also constitutes a material adverse employment action for her *prima facie* retaliation case.

### iii. *Replacement by Other Employees*

Third, Ramos alleges that she was "replaced by people that were inexperienced for the duties assigned to [Ramos]" and then moved to a different crew. Dkt. 33 at 11. Specifically, Ramos claims that office employees would come out to the field to replace her:

> I normally would handle confined space, and it got to the point where they pulled our office girl to come out to the field so she could handle my job duties, and I would be placed on a different crew . . . They pulled the girl from the office out to come out and help when her help really wasn't needed.

Dkt. 32-1 at 23. When asked for clarification, Ramos testified:

> Once after all of this I started noticing that, you know, I would be doing the paperwork, because that's the crew that I'm with and I know how to prepare for it so I would have to start doing the paperwork, and then out of nowhere they pulled her out of the office and she'll come up and I'll have to help her do the paperwork for that job that I had already started, because they wanted us to swap out.

*Id.* at 24. Ramos contends that these changes, separate from her reassignment to more strenuous work, also constitute material adverse employment actions. Dkt. 33 at 11.

However, Ramos has not alleged that her replacement by the office employee and assignment to a different crew, by itself, was harmful or less desirable than her previous work. Moreover, Ramos had been reassigned to a different crew at least twice prior to making the harassment report. Dkt. 32-7 at 3 (Morales Timeline). Given the dearth of evidence on this issue, Ramos has not carried her burden of showing how these changes would have dissuaded a reasonable employee in Ramos's position from making a harassment complaint. *See Burlington*, 548 U.S. at 68. Thus, these changes are not materially adverse and do not support Ramos's retaliation claim.

iv.     *Denial of Overtime*

Fourth, Ramos alleges that she was denied overtime following her harassment report. Dkt. 33 at 11. Ramos testified that she previously worked about forty hours of overtime weekly, but that she worked only five to ten hours of overtime per week after she filed her report. Dkt. 32-1 at 26–27. Ramos stated that she worked less overtime because she was assigned to different crews that were not "require[d] to stay late." *Id.* at 25.

The Fifth Circuit has acknowledged that denial of overtime assignments could potentially be materially adverse. *Magiera*, 389 F. App'x at 438. However, the court emphasized that a plaintiff complaining about denial of overtime must give some explanation as to "why the denial of these opportunities negatively affected her status, benefits, prestige, or responsibilities"; the plaintiff's bare assertion that she was denied overtime was not enough to show that the denial was material. *Id.*; *accord Sims v. District of Columbia*, 33 F. Supp. 3d 1, 8 n.4 (D.D.C. 2014) (noting that the 6th, 7th, and 11th Circuits require allegations beyond mere denial of overtime to show material adversity).

Here, again, Ramos provides little evidence on this issue other than her brief testimony, and the testimony only addresses the decrease in overtime and not its effect on her benefits or status. Dkt. 32-1 at 25. Further, Ramos has failed to show that PCI's actions actually constituted a denial of overtime. Ramos did not request additional overtime after her schedule changed, and she has not produced any other evidence that PCI knew about her desire for overtime hours and denied her that opportunity. *Id.* Although Ramos testified that she did not request more hours because she believed her request would be denied, Ramos provides no evidence to support this claim other than her own subjective belief. *Id.* Moreover, Ramos had requested a change from the night to the day shift following her harassment report, and that request was granted. Dkt. 32-1 at 27–28. Ramos has

15

therefore failed to set forth specific evidence that creates a genuine issue of material fact for trial, and her overtime claim fails. *See* Fed. R. Civ. P. 56(e).

     v.     *Disciplinary Action*

Finally, Ramos alleges that PCI retaliated against her by subjecting her to "disciplinary action when a policy was not violated." Dkt. 33 at 11. However, as with her employee-replacement and overtime claims, Ramos provides only minimal evidence as to the factual circumstances surrounding her reprimand. Ramos testified only that she believed that she received a retaliatory reprimand, without providing details:

> Q: Okay. We're now going to talk about your retaliation allegations. Tell me why you believe you were retaliated against.
>
> A: My reprimand, being that that was never an issue, and by the statement that Latisha [Hayes] said, which was, I too, have to keep my job. Letting them know that she's on their team by committing such act against me.

Dkt. 32-1 at 23. Ramos has not provided any evidence as to what form of reprimand she received, what the consequences of the reprimand—if any—were, or the grounds on which PCI issued the reprimand. Ramos has therefore failed to show how the reprimand would have dissuaded a reasonable employee from making a harassment complaint, and her claim fails. *See Burlington*, 548 U.S. at 68; *see also Perez v. Brennan*, --- F. App'x ----, No. 18-40520, 2019 WL 1387825, at *2 (5th Cir. Mar. 26, 2019) (affirming the district court's holding that a warning letter was not materially adverse); *DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 F. App'x 437, 442 (5th Cir. 2007) (holding that a written warning was not materially adverse when there were "colorable grounds" for the warning and the plaintiff was not dissuaded from filing a discrimination charge following the warning).

### 3. Causal Connection

Next, to complete her *prima facie* case, Ramos must demonstrate a causal connection between her harassment complaint and the remaining alleged instances of retaliation: (1) the change from day to night shifts; and (2) the reassignment of job duties. *See LeMaire*, 480 F.3d at 388. It appears that Ramos's only evidence of causation is the timing of the alleged retaliatory acts. *See* Dkt. 33 at 11.

"While suspicious timing alone is rarely sufficient to establish the requisite causal connection," the Fifth Circuit has held that temporal proximity alone may support a *prima facie* case if it is "very close." *Valderaz v. Lubbock Cty. Hosp. Dist.*, 611 F. App'x 816, 823 (5th Cir. 2015) (citations and quotations omitted). "[A] time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes." *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (quoting *Weeks v. NationsBank, N.A.*, No. CIV.A. 3:98-CV-1352M, 2000 WL 341257, at *3 (N.D. Tex. Mar. 30, 2000) (Lynn, J.)); *see also Valderaz*, 611 F. App'x at 823 ("Here, fewer than four months elapsed between the time that Valderaz reported sex harassment to his supervisor and his termination. Therefore, Valderaz has established his prima facie case for retaliation."); *contra Flanner v. Chase Inv. Servs. Corp.*, 600 F. App'x 914, 922 (5th Cir. 2015) (holding that a four-month time lapse, without more, is insufficient).

Here, all of the alleged retaliatory acts occurred between August 12, 2016, when Ramos filed the harassment report, and December 1, 2016, when PCI terminated Ramos's employment. Dkt. 32-1 at 23–25 (Ramos Depo.). Thus, the acts occurred less than four months after Ramos's report. Given this short time frame and Ramos's allegations of multiple retaliatory acts, Ramos has demonstrated a genuine issue of material fact on the causation element of her claim.

### 4. Legitimate, Non-Retaliatory Reason and Pretext

Because Ramos has established a *prima facie* case of retaliation, the burden shifts to PCI to produce evidence of a legitimate, non-retaliatory reason for the materially adverse employment actions. *McCoy*, 492 F.3d at 557. PCI has not produced any evidence of a non-retaliatory reason for either the change to the night shift or Ramos's job duty reassignment. Therefore, PCI has not carried its burden and Ramos need not show evidence of pretext.

### IV. CONCLUSION

PCI's motion for summary judgment (Dkt. 32) is GRANTED with respect to Ramos's hostile work environment claim. The motion is also GRANTED with respect to Ramos's retaliation claims based on: (1) replacement by other employees; (2) denial of overtime; and (3) disciplinary action. The motion is DENIED with respect to Ramos's retaliation claims based on: (1) Ramos's shift change and (2) her job duty reassignment.

Signed at Houston, Texas on April 15, 2019.

_____
Gray H. Miller
Senior United States District Judge